Good morning, Your Honors. May it please the Court, my name is David Schlesinger. I represent the appellant David Lincoln Johnson. Thank you very much, Your Honor. With the Court's indulgence, I'd like to address the issues in a slightly different order from how they appear in our briefing. I'd first like to start with the Brady-Giglio issue and then proceed to our third issue, which is the Rule 29 issue regarding Counts 2, 6, and 9 of the indictment as it was amended. I'd then like to address the Rule 404B argument, time permitting, and then address sentencing disparity before reserving approximately two to three minutes for rebuttal, if I can manage my time properly. Go ahead. Certainly, Your Honor. Thank you. Contrary to the government's characterization of Katherine Lipscomb, who was the COO and CFO of Financial Solutions in 2004, as a, quote, we would submit that within this case's overall context, she was actually the most important witness in the case regarding the government's effort to tie Mr. Johnson to the mailing element of the Section 1341 counts. Mr. Johnson, as the evidentiary record illustrates, didn't personally or in any way direct anyone to mail the 14 promissory notes that underlie the 14 counts of the amended indictment. So the only theories under which the government could have secured Mr. Johnson's convictions on those counts is either a co-scheme or theory under which the government would have had to have proven beyond a reasonable doubt that it was reasonably foreseeable to Mr. Johnson that someone involved with the putative scheme would have mailed the notes, or an aiding and abetting theory under which the government would have been required to show that Mr. Johnson, as the district court correctly instructed the jury, had to have aided in abetting each of the four elements of Section 1341. Ms. Lizgum gave crucial testimony that the government cited in both its opening statement and its closing argument regarding Mr. Johnson supposedly having visited the Financial Solutions offices in the Inland Empire, various parts of the Inland Empire, seven to eight times in the, I believe it was the 2003-2004 period, to pick up checks for his company, Gentech Fabrication, from Financial Solutions. That's the only evidence linking Mr. Johnson to the actual premises of Financial Solutions where the mailing operations were ongoing for the promissory notes. So that was highly material testimony that was impacted by Mr. Johnson's not having the unredacted PSR that the government produced three weeks following the last day of trial to Mr. Johnson's trial counsel. In that unredacted PSR, the probation office revealed that Ms. Lizgum had said that during the time period when she was the CFO and COO of Financial Solutions, she was taking a cocktail of medications that were so powerful and so difficult for her to withstand that she would sometimes get off of them because they made her sluggish, drowsy, and unable to function normally. Those are more or less the exact words that appear in the PSR. Mr. Johnson did not have that information at trial and did not have an opportunity to impeach Ms. Lizgum during cross-examination regarding her cognitive deficiencies during that time. And I should note, just to step back just a second, Your Honors, we're highly sympathetic to Ms. Lizgum's mental health history and the depression and PTSD and other maladies that she's suffered. But simply put, Mr. Johnson did not have a meaningful opportunity to cross-examine her regarding those conditions, the mix of medications she was taking, and the impact that it would have had on her ability to recall the operative events in this case. She did testify, did she not, that although the common practice was to mail, there were also hand-delivered, correct? She actually did, Your Honor. Yes, you're correct, Your Honor. She did testify that the promissory notes were sometimes hand-delivered. Another former sales agent of Financial Solutions, Steve Denham, testified that he hand-delivered the majority of promissory notes to his clients. A witness who had received promissory notes, who was an investor, Ignacio Murillo, testified that some of his promissory notes that he had signed were hand-delivered. Gerald Gorton, whom I will address in just a bit, testified that promissory notes were usually delivered. That was his exact word, usually, but he didn't say that they were delivered 100% of the time. Was there any evidence introduced at trial that established that Steve Denham was Robert Thompson's sale agent? I think that's the strongest argument on those three counts. That's an interesting question, Your Honor, because it did come out during the hearing on Mr. Johnson's post-trial Rule 29 motion regarding counts 2, 6, and 9. This was admitted by the AUSA, who did the argument for the government pre-dissiporation. She acknowledged at that argument, at that hearing, that Mr. Denham had been Mr. Thompson's agent. There wasn't actually any evidence in the trial record, though, that indicated that Denham was Mr. Thompson's agent. But we submit still, Your Honor, that that's fairly probative regarding just simply how ambiguous this evidentiary record was regarding the mailings of the notes. Notwithstanding the proof deficiencies regarding 2, 6, and 9, counts 2, 6, and 9, which I'll address in a little bit, Ms. Lipscomb, in addition to having given highly material testimony regarding Mr. Johnson's putative link to the mailing practices, also testified that Mr. Johnson had appeared at a financial solutions investor recruitment event at the Ritz-Carlton Hotel in Marina del Rey on June 9, 2004. And she said Mr. Johnson was not only there, but he gave a detailed PowerPoint presentation about the role that gen-tech fabrication was supposedly playing in developing the empennage, the so-called 0280 contract. And the reason why that testimony is highly material is the government adduced proof at trial that the 0280 contract had been canceled by the Air Force on May 26, 2004. So even though there were a couple of other witnesses who generally placed Mr. Johnson at these recruitment events, Ms. Lipscomb was the only one who said that Mr. Johnson not only spoke, but actually gave a very detailed PowerPoint presentation to the investors. In addition, getting back to the suppressed evidence, in addition to evidence regarding Ms. Lipscomb's mental health conditions, there was also suppressed evidence regarding Ms. Lipscomb having told the probation officer that she had never personally profited from the scheme. Separately, the government had produced in discovery, and this was mentioned in Mr. Johnson's post-trial brief, the government had produced a memorandum of interview with Christiano Hashimoto, the lead defendant, as you will, that Ms. Lipscomb had indeed written a $600,000 check to her son, who was involved with a country, not directly to her son, but he was involved with a company called Tremation in Las Vegas. So that suppressed evidence prevented Mr. Johnson from having a meaningful opportunity to cross-examine Ms. Lipscomb regarding her truthfulness regarding whether she had ever profited from this scheme. Let me also note something else before I move on to the Counts 2, 6, and 9. And this goes along the lines of what Judge Worley had pointed out regarding the reference at the Rule 29 motion hearing to Denham having been the agent for Robert Thompson. The district judge, Judge Phillips, actually commented on Ms. Lipscomb's testimony at trial. Let me read you the direct quote from ER 1904. She said, quote, I did not view the defendant's testimony at trial as being particularly useful or credible. I don't think she came across very well as a witness, but she did give some useful information as to the mechanics of the scheme. I did not think she came across particularly well to the jury as a forthcoming witness. So when you look at this Court's case law, including most recently in United States v. Settigati, which was decided in 2013, even though Mr. Johnson had some opportunities to cross-examine Ms. Lipscomb regarding her credibility and her motives for testifying against Mr. Johnson, he didn't have the opportunity to meaningfully cross-examine her about all the different avenues that he could have pursued to diminish her credibility. And as I noted, Settigati had also held it significant that the government had specifically alluded to Ms. Lipscomb's testimony in both its opening statement and in its closing argument, and particularly to bolster its theory that Mr. Johnson had either been a co-schemer or an aid or a better regarding the mailing element of 1341. Let me briefly move on to the Bill 29 argument regarding Counts 2, 6, and 9. Simply put, when you look at the evidentiary record, Your Honors, the only evidence regarding the supposed mailings to Mr. Thompson appears in A, Exhibits 21 through 23 of the evidentiary record, and Ms. Lipscomb's testimony about those notes, which was only limited to her testifying that she had stamped Mr. Hashimoto's signature on those notes. She didn't testify that she had placed those notes in the mail. There was obviously no testimony from Mr. Thompson regarding anything. He didn't appear as a witness. He wasn't called, so we don't know what he may have relied on when he read those notes. We don't know if he read the notes at all. We certainly don't know if he read the notes. We certainly don't know if he received the notes in the mail. And as Judge Ward alluded to earlier, and I responded to her, Steve Denham, the government admitted during the Rule 29 motions hearing, had been the agent for Mr. Thompson. And Mr. Denham had testified that he hand-delivered the majority of his promissory notes, his client's promissory notes, to the clients themselves. So at a bare minimum, I would submit that this Court would have to reverse the conviction on Counts 2, 6, and 9 and remand for resensing. Before I reserve some time for rebuttal, I would like to note that even though under that limited scenario, if the Court doesn't reverse under Brady-Giglio or the Rule 404b issue, even though theoretically if 2, 6, and 9 are reversed, there would still be 11 counts of conviction remaining, the Court could take judicial notice that Mr. Johnson has recently been transferred from FCI Lompoc, where he was originally incarcerated, to the Federal Medical Center at Butner, North Carolina. I have to acknowledge that I have not been in contact with Mr. Johnson recently, so I don't know what precisely precipitated that move. He was 75 at the time of sentencing? He was 74 at sentencing. He's 75 now. He's 75 now. His schedule would be released in about 10 years. So he would be, I believe, 85 at the time of his scheduled release if he managed to survive that long. So I do note that this would not be a routine resentencing proceeding. Mr. Johnson presumably would be able to submit evidence of whatever serious medical condition has prompted BOP to transfer him to Federal Medical Center in Butner, North Carolina. As much as I'd like to get to the other two issues, I really would like to reserve some time for rebuttal. All right. So thank you, Your Honors. Your arguments are preserved because they're in the briefs. You may proceed. Thank you, Your Honor. May it please the Court, my name is Sean Peterson. Pull the mic up. My name is Sean Peterson, and I represent the United States in this case. Defendant Johnson was convicted of 14 counts of mail fraud in relation to a scheme that investors lost a net of $16 million. And I'd like to start off by emphasizing some key facts in the case and a timeline of events before focusing on the arguments that have been raised. Now, Defendant Johnson was the president of Gentech Technologies, and they were involved in fabricating different types of hardware. And, in fact, they were involved in fabricating a maintenance stand that is at issue in this case, a maintenance stand to work on the C-5 cargo aircraft. Now, the fraud here wasn't only done through Defendant Johnson. It was done through other co-schemers as well, in particular an individual named Mr. Hashimoto, who was the president of Financial Solutions. Financial Solutions was the investment vehicle that went out and collected funds and promoted the investment opportunity to potential investors. Mr. Hashimoto made representations. Sales agents that worked for Mr. Hashimoto made representations. Now, I'm bringing this up because I think it's important to talk about their role. Their role in the scheme was what I would call an opener. They made the contacts, they brought in the investors, and if the investors were ready to proceed at that point, they could very well do so. However, it's important to talk about Mr. Johnson's role. Mr. Johnson's role is what I would call the closer. If an investor then wanted to see more, if an investor wanted to, you know, wasn't yet ready to make the investment, the investor had the opportunity to go to Gen Tech's facilities and there met with Mr. Johnson, potentially met with others, and could receive additional information. Mr. Johnson closed the deal. Now, the contract, there is a contract that was, that existed between an entity known as CAMP, that's an acronym, CAMP and the U.S. Air Force. This was for the development of a prototype maintenance stand. I'm so sorry, but I don't seem to be hearing you very well. Are you speaking into the microphone? I'm sorry, Your Honor. I'll make sure to do that going forward. The contract was initially awarded to CAMP only to build the prototype in 1998. And through November of 2000, CAMP received approximately $1.65 million in progress payments. That was the end of the progress payments. Now, CAMP ran into financial difficulties, and in the fall of 2003, it entered into an arrangement with Gen Tech, a defendants company, whereby it moved into the facilities that were held by Gen Tech. Gen Tech and CAMP also entered into a purchase agreement under the terms of which Gen Tech would be paid approximately $700,000 to complete the prototype stand. Now, Johnson and CAMP and Gen Tech tried to take additional steps to more formally give control of that contract to Gen Tech and ask that the Air Force assign future payments to Gen Tech, and that request was officially rejected by the Air Force. Now, on May 26, 2004, a very important date in this case, the Air Force communicated to CAMP that it was canceling the contract. And again, this contract was just to build the one prototype maintenance stand. So on May 26, 2004, this was communicated to CAMP. Patricia Coleman, the president of CAMP, testified that she advised Mr. Johnson of the cancellation on or about the same date. There's also additional information in the record that Mr. Johnson was aware of the cancellation. I'm not sure where you're going with this background, but at some point would you come to the issue that counsel spent his time on, which is counts 2, 6, and 9 and the proof of mail, use of the mail? Yes, Your Honor. It might take approximately one minute to hit the last few points there. Actually, you know, I'll just tell you, we've all read your briefs, and we know what happened, and we know the timeline. And so if you maybe could just address the issues that are important here, both the Brady and the elements of mailing on counts 2, 6, 9. Thank you. In sum, Your Honor, the emphasis I wanted to make earlier was that the government presents that there's very strong evidence of the defendant's knowing participation in this fraud based on his activities after he clearly was aware of the cancellation. Now, focusing on the ---- Okay. So why did you withhold the Brady material? The Brady material was inadvertently withheld, Your Honor. The government apologizes ---- The government always says. How is it not material to the cross-examination of Ms. Lipscomb? So the government's argument on this point, Your Honor, is twofold. One is certainly that it's not material in regards to Ms. Lipscomb, but it's also that it wasn't suppressed. And so, you know, with this regard, the government produced a great deal of discovery in this case, generally speaking, and also with particular relevance to Ms. Lipscomb. It seems that the PSR on Lipscomb and Hishimoto, the two other schemers who had the most involvement with the frauds, would have been both highly material and would be something that the government would have if they were just sentenced, it would have, you know, in the forefront of its knowledge. May I start by addressing the suppression point, Your Honor? Okay. And then Bill Teague. I don't know why you don't want to answer our questions, why you just want to tell us what you want to tell us, but usually, you know, you should focus on answering our questions. But if you want to talk about suppression, go ahead. I apologize. I apologize, Your Honor. Why is it not material? It's not material for several reasons, Your Honor. First, the defense had a great deal of material that it could use, some of which it did use, to impeach Ms. Lipscomb. It had memorandums of interviews involving her. It had her criminal history. It had her plea agreements. This is all information that the defense had prior to trial relating to Ms. Lipscomb. What it didn't have is the extent of the drugs she was on during the commission of the crime. It's true, Your Honor. It didn't have all of that information. However, it did have a lot of that information, partially because of the disclosures that had been made by the government prior to trial, but also in part because of the fact that the plea hearing involving Ms. Lipscomb occurred before trial in this case. And this is apparent from the transcript of the hearing on the motion for a new trial. Defense counsel, in fact, was aware of this and had ordered the transcript. And my understanding, though, was that the plea colloquy, it wasn't as complete information of all the cocktail of events, of drugs that she was on during the very events of this scheme. Your Honor, I would submit that the information in the record doesn't precisely say what drugs she was on or that she may or may not have been on at a time that she was involved in this scheme. But, yes, Your Honor, I agree that not all of the drugs that were referenced in her plea colloquy were referenced in the pretrial services report. In other words, there were additional drugs referenced in the pretrial services report, and there were additional mental and emotional concerns expressed in the PSR. That being said, Your Honor, the defense was aware and was on notice of a great deal of that information. The government's argument on this point is not that the defendant had every single detail pretrial, but that the defense had a great deal of the details, and it had enough pertinent details for the relevant areas in which cross-examination and impeachment could be done. And in talking about materiality, Your Honor, in particular with regards to Ms. Lipscomb, Your Honor, much of Ms. Lipscomb's testimony was also corroborated by other pieces of evidence or other witnesses at trial. For example, she spoke a great deal of the practices of the office and the money coming, she spoke to some extent about money coming in and out of financial solutions, for example. John Lucero of IRS-CI also testified to some extent in these areas. And then particularly with regards to mailing, yes, she did testify as to the general practices of financial services, being that it mailed promissory notes. And she also testified that she herself processed the notes for Mr. Thompson. And you can combine that with her testimony regarding general process, which was that in processing the notes, she then sent them out to be mailed. How was that reliable, though, given that we know that Thompson was Denham's sale agent and, I mean, Denham was Thompson's sale agent, and Denham delivered his and didn't put him in the mail? Your Honor, I regret that I don't have that part of the transcript in front of me that defense counsel referred to. Can you answer the question? Okay. On the record, Denham did not testify that he hand-delivered every single one of his notes. That's right, because you have to prove whoever put them in the mail. If some of them were delivered by hand, who hasn't got a case? Yes, Your Honor. It's on the gun, but not the defendant to show the mailing. So how do you prove it, if that was not the consistent practice? Right, Your Honor. Thank you. Well, how do you prove it? Your Honor, the government submits that the reason... We just guess? We just guess because the government likes us to guess? I'm sorry, I didn't hear that. Tell me, how do you prove it? Your Honor, the government submits that a reasonable inference can be drawn from... Why was it not a reasonable inference if the practice is sometimes to deliver by hand? How is it a reasonable inference if both are available? Your Honor, I would like to speak to that, Your Honor. What's that? I will address that. What's the question? Give me an answer. Yes. I would like to point the court to the testimony of Wendy Mazariegos, who also worked in the Financial Solutions Office, and she testified as to her duties in the office, and that involved preparing the promissory notes, which were mailed. And she said she testified in substance that the practice of the office was to mail those notes, whether she did it herself or some other people in the office did that. So you didn't have Thompson come in and say he received these by mail? Correct, Your Honor. Thompson did not testify. You said that they put them in the mail, and you had Denham say that he delivered his. So how is that proof beyond a reasonable doubt that they were mailed? I would like to explain my understanding of the record, Your Honor. Denham testified that many of his promissory notes he hand-delivered, but not all of them. But the question is on you, not him. I agree with that, Your Honor. And with the particular point on the... How do you generally prove mail fraud? I mean, how do you generally prove that something was put in the mail? This is a mail fraud, 14 counts of mail fraud. Right. On the mailing? The mailing element. Your Honor, usually evidence is submitted to show that an item was mailed. Yeah, you usually have proof that it was mailed. Yes, Your Honor. And here we don't have that. We have a general practice in the office. I agree, Your Honor. We have strong evidence of a general practice in the office. We have testimony from... Have we ever upheld a mail fraud conviction where we have said it was sufficient to prove a general practice, even if there is testimony in the record that there were exceptions which involved hand delivery? No, Your Honor, not to my knowledge. So if we were to write an opinion in this case, we would be extending the law? Your Honor, I would submit that the converse is also true. In my search, I didn't find the opposite. Well, the burden, as Judge Noonan indicated, is on the government to establish the jurisdictional or the criminal prerequisite that there was a use of the mail on a particular count in this case. And you have three counts involving a singular investor. Do we know why Thompson wasn't available? I do not know, Your Honor. I apologize. That was not trial counsel. Okay. All right. But you did have some other victims testify? Yes, Your Honor. And did they testify as to their counts that they received the security in the mail? Yes, Your Honor. But you didn't have a similar testimony with respect to Thompson? Correct, Your Honor. The closest that the government's evidence comes to that is the testimony particularly from Ms. Lipscomb that she herself processed Mr. Thompson's promissory notes. And that's why the failure to produce the Lipscomb-Grady evidence is all the more material, isn't it? It very well could, Your Honor. At the same time, addressing the question about the defendant's knowledge or the reasonable foreseeability that the mails were used in this case, the government would note that taking into account the way that the scheme was set up and the role of financial services and the role of the defendant, we also have evidence in the record that the defendant signed a number of promissory notes himself. And it appears that as time went on, more of the promissory notes were signed exclusively by either Hashimoto or Lipscomb. Nonetheless, there are a number that were signed by the defendant, Johnson. And did you limit the counts to involve those that were signed by Johnson? No, Your Honor. So you had notes signed by other people. What about the Thompson ones? Who signed those? I believe those were signed by Hashimoto, Your Honor. I would need to double-check the record. I have one question that does not go immediately to the issues on appeal, but I cannot help noticing the age of the defendant and the length of the sentence. And I believe he'll be well into his 80s by the time he's out of prison. Was there some reason for such a draconian sentence? Well, Your Honor, the district court in her comments at sentencing stated that she found the defendant to be a key player in this scheme, which was a significant scheme, as I stated earlier, causing over $16 million in net losses to a number of people, including a number of witnesses that testified to essentially having their life savings ruined through this scheme. The defendant was sentenced within the guidelines. There's no question about him not receiving a guideline sentence. And that, coupled with the evidence that was submitted regarding his participation in the scheme, was the basis for the judge's ruling. If I may, Your Honor. How many criminal history points did he have? I'm sorry, Your Honor. I don't remember off the top of my head. Was there evidence that he had committed prior crimes? No, Your Honor. So this is his first crime. He was convicted in another case at more or less around the same time. But I think, to respond directly to the court's question, I think at the time he was sentenced and he was sentenced, he had zero criminal history points. Zero. All right. You're well over your time. I'm sorry. Thank you. Do you have any further questions? Argument. Oh, I'm sorry. Oh, you were talking. Talking to the sky. Yeah. Got it. Okay. So, yes, do you have a minute or something for rebuttal? You were talking. I'm talking to the sky. Thank you, Your Honor. Let me quickly address a couple of record items that I think the court might find to be probative. The reference to AUSA's supportees discussing Thompson having denim as his sale agent appears at ER 267. The relevant passages of Ms. Lipscomb's Rule 11 colloquy appear at ER 381 and 382. She only acknowledged during that Rule 11 colloquy that she was taking two antidepressants, and she was taking a panoply of other medications, but they were for physical ailments. Yes. I guess the PSR said that she had post-traumatic stress disorder. That's correct, and that was also not revealed during the Rule 11 colloquy. Yeah. And what was the trauma from which she developed the PTSD? To the extent we could talk about it on the open record, Your Honor, I think it relates to her personal family history, her childhood, and some horrible abuse that she suffered. Again, we're very sympathetic to what she's had to endure, but that doesn't mean that Mr. Johnson should have been precluded from having the opportunity to cross-examine her about many issues that could have been probative to her recall and her credibility in general. I also mentioned briefly in the Rule 11 colloquy that she mentioned that she was being treated for depression, but as Your Honor mentioned, she was not being treated for PTSD. She did not mention PTSD. And just to wrap up quickly, Mr. Johnson is serving a parallel sentence right now, but he did not have any criminal history points at the time he was sentenced in this case. And addressing Judge Fischer's questions regarding the state of the mail fraud case, I'm also not aware of any case that holds from this Court that the government can talk to, can adduce proof of general mailing practices to prove that a specific mailing had actually been placed in the U.S. mail. I think it's fairly clear that the government, as it did for 11 other counts, has to have specific evidence that the person in question, at least in this kind of scheme, actually received the note or some kind of document via the U.S. mail. How long is the concurrent sentence that he's serving? How long does that run? I'll have to check that, Your Honor. I'd be glad to send a letter to the Court if the Court would like some further information about this. I believe it is in the 18 to 24-month range. I think that just to specify, I think part of it was concurrent, part of it was consecutive. I think only about 18 to 24 months of it was actually consecutive. So he's probably going to be fairly close to actually finishing the consecutive part of the sentence. All right. Thank you, counsel. The U.S. v. Johnson is submitted.
judges: Noonan, Wardlaw, Fisher